496 P.2d 281

**PARMA SEED, INC., Plaintiff-Respondent,**

v.

**GENERAL INSURANCE COMPANY OF AMERICA, Defendant-Appellant.**

No. 10387.

Supreme Court of Idaho.

April 17, 1972.

Elam, Burke, Jeppesen, Evans & Boyd, Boise, for defendant-appellant.

Schiller, Young & Williams, Nampa and Moffatt, Thomas, Barrett & Blanton, Boise, for plaintiff-respondent.

McQUADE, Chief Justice.

The facts giving rise to this litigation are neither complex nor in dispute. It appears that respondent Parma Seed, Inc. purchased a blanket liability insurance policy from appellant General Insurance Company of America. Appellant's agent suggested that respondent purchase "products coverage," but respondent declined this additional coverage. During the period when the blanket liability policy was in effect, respondent received orders for a certain weedkilling chemical. Respondent's supplier delivered the wrong product to respondent's premises, and respondent's agents passed this more potent product on to respondent's customers. The result was the destruction of several field crops upon application of the product.

Claims were made against respondent and its supplier by respondent's customers, and respondent made demand upon appellant to adjust these claims. Appellant refused, maintaining that these claims were exempted from coverage under the insurance contract. Respondent thereafter filed its complaint initiating the case now before us.

The insuring agreement provided that appellant agreed

"To pay, * * * on behalf of the insured, all sums which the insured shall become legally obligated to pay as damages because of an occurrence which causes bodily injury * * * or injury to or destruction of property * · * *;

further, to defend any suit against the insured in which damages are sought."

The insurance contract provided further, in an endorsement prominently entitled "Products and Completed Operations Exclusion,"

"In consideration of the premium at which this policy is written it is agreed this policy does not apply to liability, claims or expense arising out of products or completed operations as defined below:

(1) goods or products manufactured, sold, handled, or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented, or controlled by the named insured; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold; or on premises owned, rented or controlled by the insured, if used in connection with or consumed in any of the following types of enterprises:

(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured: provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pickup or delivery, execute from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials. The word 'operations' includes any act or omission in connec-

tion with operations performed by or on behalf of the named insured on the premises or elsewhere, whether or not goods or products are involved in such operations."

The insurance contract also provided, in endorsement "L–144," that

"In consideration of the premium charged, it is agreed that such coverage as is afforded by the policy does not apply as respects:

1. Erroneous delivery of seeds, meaning wrongful filling of orders whereby the seed genus or species delivered differs that thet ordered by the customer.

2. Any claim for loss of crop due to nongermination, cross pollination, diseased and/or poisoned seed."

Upon trial of the case to the district court, it was held that coverage for the liability incurred by respondent was afforded by the policy. Neither the "products" nor the "completed operations" exclusionary clauses, *supra,* were found by the district court to exclude coverage. Appeal from the district court decision was had to this Court, and we issued a unanimous opinion November 30, 1970, reversing the judgment of the district court. Petition for rehearing was filed by respondent on December 18, 1970, and granted on February 4, 1971. The case was reargued in March, 1971 and January, 1972. It is the conclusion of this Court that the opinion of November 30, 1970, in this case, should be and is hereby withdrawn, and this opinion is substituted therefor.

■ The focus of this litigation is upon the "products and completed operations" exclusionary clause of the contract of insurance. To decide whether coverage for the liability giving rise to this litigation was excluded under the "products" portion of the exclusionary clause, as is contended by appellant, we must determine whether the liability is one "arising out of products" as defined in the policy, quoted *supra.* We read this exclusionary clause to exclude coverage if the liability for which respondent is seeking indemnification arose out of products manufactured, sold, handled, or distributed by respondent, if the accident giving rise to the liability occurred after possession of the goods has been relinquished to others, and if the accident occurred away from respondent's premises. Indeed, it would be difficult to phrase the exclusion any more succinctly than it is phrased in the policy exclusionary clause. We think it is clear that when liability results from the functioning or malfunctioning of a product sold by respondent, and the event establishing liability (i. e., the accident) occurs after relinquishment of possession of the product by respondent, and occurs away from respondent's premises, coverage is excluded. That is precisely the situation in this case.

Respondent strongly argues that liability does not "arise out of" a product sold by respondent unless the product was inherently defective, or at least malfunctions. It is contended that liability arose in this instance out of respondent's "on premises" negligence in failing to detect that the wrong product had been received from the supplier, and not out of the product itself. Closely related is the contention that the "accident" in this instance was the misdelivery of the product on respondent's premises.

Respondent cites a number of cases and authorities in support of its contentions as to the scope of the phrase "liability arising out of products." However, in Employers' Liability Assurance Corp. v. Youghiogheny & Ohio Coal Co.,[1] cited by respondent, the Court clearly stated that the injury involved resulted from a defective freight car, and not the insured's coal, and therefore the products exclusion was inapplicable. So also, in Lessak v. Metropolitan Casualty Ins. Co. of New York,[2] the facts distinguish the Court's decision that the products exclusionary clause is inapplicable. The Court there observed that liability for the sale of air-gun pellets to a minor (with

1. 214 F.2d 418 (8th Cir. 1954).

2. 158 Ohio St. 153, 151 N.E.2d 730 (1958).

resulting injury to another) arises from the minority of the child, and not from the product. The decision, furthermore, turned upon the phrasing of a clause in the contract *granting* coverage.

In support of its reading of the scope of the clause in issue, respondent also relies upon several works on insurance law. Respondent quotes Appleman, Insurance Law and Practice, as stating:

"'[I]f the operation has been completed, and liability results thereafter either by reason of a defect in merchandise or improper workmanship, that is called products liability or completed operations, the protection of which can be purchased for a premium.'" (Respondent's emphasis).[3]

However, the language in the same paragraph which precedes the quoted sentence is significant. The first part of the paragraph states:

"It is apparent that liability under what we ordinarily term 'public liability' coverages can arise fundamentally in three distinct ways. An injury or a loss may result while an activity is in progress, and prior to the completion thereof, either as a result of an act of negligence or an omission. That is what is embraced within the ordinary liability aspect of a public liability policy."[4]

Then follows the sentence quoted by respondent. The third way liability arises, as categorized by Appleman, is through damage to the product itself, e. g. shipping losses. It may readily be seen that the Appleman statement, viewed in context, lends little support to respondent's contention that the products exclusion in this contract does not apply if the product is not inherently defective or if liability results from delivery of the wrong product. The same infirmity is encountered in the statements quoted from other works. These general statements simply do not establish that the products exclusion here in issue is as narrow as respondent contends.

Respondent cites Atkins v. Hartford Accident & Indemnity Co.;[5] Brant v. Citizens Mutual Automobile Ins. Co.;[6] Stevens Industries, Inc. v. Maryland Casualty Co.;[7] Thibodeaux v. Parks Equipment Company,[8] and St. Paul Fire and Marine Ins. Co. v. Coleman[9] for the proposition that liability arising from delivery of the wrong product, as opposed to delivery of the correct product which turns out to be defective or otherwise gives rise to liability, is not excluded by the products exclusion clause before us. We do not find these cases persuasive. The *Atkins* and *Brant* cases turned upon the courts' conclusions as to the place where the accident occurred. The *Stevens* case is distinguishable on the same basis. The *Thibodeaux* case was decided on the basis of an ambiguity found in the contract of insurance; we must agree with the well reasoned dissent in that case, that the ambiguity rationale was tenuous. The decision is not persuasive for respondent's position herein. The *St. Paul Fire & Marine Ins. Co.* case is distinguishable on its facts. In short, respondent offers no persuasive authority for the proposition that the phrase "liability arising out of products" does not include the liability incurred by respondent in this case from the sale of the wrong chemical.

On the other hand, we do not find the cases cited by appellant to be particularly persuasive as to the scope of the phrase "liability arising out of products." The cases are generally distinguishable on the basis of the portion of the exclusionary clause focused upon by the deciding court,[10] or on the basis of differences in

---

3. 7A Appleman, Insurance Law and Practice, § 4508, p. 98.

4. *Id.*

5. 7 Mich.App. 414, 151 N.W.2d 846 (1967).

6. 4 Mich.App. 596, 145 N.W.2d 410 (1966)

7. 391 F.2d 411 (5th Cir. 1968).

8. 140 So.2d 215 (La.App.1962).

9. 316 F.2d 77 (8th Cir. 1963).

10. *See,* Orchard v. Agricultural Ins. Co. of Watertown, N.Y., 228 F.Supp. 564 (D.Or. 1964), aff'd, 340 F.2d 948 (9th Cir. 1965).

phrasing in the exclusionary clauses defining the products hazard excluded.[11] However, despite aspects of the case of Tidewater Associated Oil Co. v. Northwest Casualty Company [12] which make that case distinguishable, the reasoning of the Court in that case does speak to the persistently voiced contention of respondent that it is the negligence of respondent's agents and not "products liability" as such that is involved in the case before us. The Court in *Tidewater* states:

> "In practically every case in which injury or damage is caused by the handling or use of a product, or by a defective condition in such product, the occurrence causing the injury or damage can be traced to some pre-existing negligence. Indeed, were this not so the injured person would have no basis for a tort claim against the insured. Thus, if the allegation of pre-existing negligence were to be regarded as controlling, the result would be to emasculate the product liability exclusion." [13]

We concur with this reasoning, and find it supportive of our reading of the products exclusionary clause in the case before us.

As we have previously noted, respondent contends that the "accident" occurred when the insured supplied its customers with the wrong chemical product. This event took place at the insured's place of business. Respondent further contended, during oral argument at the rehearing, that an "occurrence" was covered under the policy, but that the exclusionary clause applied only to an "accident." On this premise, respondent urged that the conflict of terms created an ambiguity in the exclusionary clause which should be resolved in favor of coverage. Respondent further contends that the "L–144" endorsement, quoted *supra*, makes the products exclusion clause ambiguous, because if the clause is read so broadly as to exclude coverage in the present case then the "L–144" endorsement is superfluous.

The latter contention carries little weight. Even if the "L–144" endorsement was unnecessary, the language of the products liability exclusion is not rendered ambiguous. In any event, it appears that the "L–144" endorsement was added to this insurance agreement to be certain that the appellant would not be liable for non-germinating seeds. It is commonplace in insurance contracts for particular endorsements, designed to ensure exclusion of specific areas of potential liability, to overlap with broader exclusionary clauses found elsewhere in the contracts. The extra measure of caution represented by "L–144" in this case does not compel us to narrow the construction we apply to the products liability exclusion.

The former contention, that the terms "occurrence" and "accident" create an ambiguity to be resolved in favor of the insured, places in issue the intent of the parties. To ascertain that intent, it is well settled that this Court must look first to the contract itself,[14] construing the document as a whole.[15] If the language of the entire contract reveals the parties' intent, it is unnecessary to examine extrinsic evidence of technical usage, or to draw analogies to judicial interpretations in other cases.[16] In

11. *See* Tidewater Associated Oil Co. v. Northwest Casualty Co., 264 F.2d 879 (9th Cir. 1959).

12. *Id.*, at 882.

13. *Id.*

14. Boesiger v. DeModena, 88 Idaho 337, 399 P.2d 635 (1965); Durant v. Snyder, 65 Idaho 678, 151 P.2d 776 (1944).

15. West v. Brenner, 88 Idaho 44, 396 P.2d 115 (1964).

16. Restatement of Contracts, § 235; 4 Williston on Contracts (Jaeger 3d Ed. 1961), § 614. Where an insurance contract plainly expresses the general objects of the parties and the conditions prescribed by the insurer, it is unnecessary to resolve ambiguities in favor of the insured. Rollefson v. Lutheran Brotherhood, 64 Idaho 331, 132 P.2d 758 (1942); Rauert v. Loyal Protective Insurance Co., 61 Idaho 677, 106 P.2d 1015 (1940).

the contract before us, the respondent agreed to pay a reduced premium for a reduced scope of coverage. Specifically, the respondent agreed, *inter alia,* that "accidents" which arose from products relinquished to customers and which occurred away from respondent's premises would not be covered. To attribute a special meaning to the term "accidents," causing it to signify something other than an "occurrence," and then to assert that destruction of the customers' crops was a covered "occurrence" rather than an excluded "accident," violates the context in which the terms are used and vitiates an essential *quid pro quo* embodied in the contract. Reading the policy in its entirety, it is our opinion that the word "accident" in the exclusionary clause was intended by the parties to cover the facts in this case, excluding them from coverage. This conclusion draws supplementary support from our recent holding in National Aviation Underwriters, Inc. v. Idaho Aviation Center, Inc.,[17] that "accidents" as that term is used in liability insurance contracts refers to the occurrence in which the injuries are suffered. In the present case, that occurrence was the application of the weedkiller to the crops, resulting in the actual damage.

It is our conclusion that the products exclusionary clause in issue must be construed to exclude coverage resulting from use of a product sold by the insured, if the "accident" giving rise to the liability occurred away from the premises of the insured after possession of the product was relinquished.

The judgment of the district court is reversed. Costs to appellant.

Neither will strict technical interpretations be employed to expand or restrict the scope of the intended coverage. Thomas v. Farm Bureau Mutual Insurance Co., of Idaho, Inc., 82 Idaho 314, 353 P. 2d 776 (1960); Miller v. World Insurance Co., 76 Idaho 355, 283 P.2d 581 (1955).

McFADDEN and BAKES, JJ., and SCOGGIN, D. J., concur.

DONALDSON, Justice (dissenting):

The majority opinion deals primarily with the "products" portion of the "Products and Completed Operations Exclusion." I agree with the majority that the question for determination under this provision is whether Parma Seed's liability *arose out of products* sold. But I reach a different result: I believe that the damages for which recovery is sought arose out of Parma Seed's *negligence in delivering* the wrong product and not out of the *product* delivered.

The exclusion in question states that "this policy does not apply to liability, claims or expense *arising out of products* or completed operations as defined below"; by its own wording, then, this provision purports to exclude only liability "arising out of products." That Parma Seed's liability did not arise out of products can most easily be seen by comparing the facts presented here with those posed by the following hypothetical. Suppose that while the seller is making a delivery to the buyer at the buyer's premises, the seller negligently drops a heavy can of weed killer on the buyer's foot, causing serious injury. It should be clear that the seller's liability would not be within the products hazard exclusion—i. e., that it did not arise out of products. The product was merely the incidental instrumentality through which the damage was done—but the cause of the injury was the seller's negligence; in other words, the seller's liability arose out of his *negligence* and not out of the *product* sold. The same can be said in regard to the case at bar. When Parma Seed received the product in question from the

17. 93 Idaho 668, 471 P.2d 55 (1970); *see also* 2 Hursh, American Law of Products Liability, § 10:5; Bitts v. General Accident Fire & Life Assurance Corp., 282 F.2d 542, 544 (9th Cir. 1960).

distributor, ten of the eleven cans of weed killer were marked with the designation "2, 4D–Butyl Ester 6," which should have indicated to its employees that the contents in these cans were too strong for the purposes intended by their purchasers. The respondent's employees failed to notice that the product did not conform to what had been ordered, however, and passed this more potent product on to its customers. Parma Seed was negligent in delivering the wrong chemical to its customers, and this negligence was a proximate cause of the crops lost. Parma Seed's liability arose out of this negligent misdelivery; it did not arise out of products any more than it would have if Parma Seed had negligently dropped a heavy product on the buyer's foot. *See* Employers' Liability A. Corp. v. Youghiogheny & O. Coal Co., 214 F.2d 418 (8th Cir. 1954); McGinnis v. Fidelity & Casualty Co. of N. Y., 276 Cal.App. 15, 80 Cal.Rptr. 482 (1969); Thibodeaux v. Parks Equipment Co., 140 So.2d 215 (La.App. 1962); Lessak v. Metropolitan Casualty Ins. Co. of N. Y., 158 Ohio St. 153, 151 N.E.2d 730 (1958); *cf.* Protane Corp v. Travelers Indemnity Co., 343 Pa. 189, 22 A.2d 674 (1941).

In discussing Employers' Liability A. Corp. v. Youghiogheny & O. Coal Co., *supra,* the majority states that the products exclusion was not applicable in that case because the injury "resulted from a defective freight car, and not the insured's coal." Actually, the injury resulted from the insured's *negligence* in loading and shipping coal in a defective freight car. 214 F.2d at 425. Similarly, the damages in the instant case resulted from the insured's negligence in delivering something which was not ordered by its customers. As the court pointed out in the *Employers' Liability A. Corp.* case, the insured's liability "had nothing to do with the products of the insured." *Id.* The majority also states that in Lessak v. Metropolitan Casualty Ins. Co., *supra,* the "liability for the sale of air-gun pellets to a minor (with resulting injury to another) arises from the minority of the child, and not from the product."

This is true to the extent that the insured's liability was "based upon the claim that the *unlawful sale* of B–B shot [by the insured] to a minor was a proximate cause in an uninterrupted sequence of an injury." 151 N.E.2d at 733; *accord,* McGinnis v. Fidelity & Casualty Co. of N. Y., *supra,* 80 Cal.Rptr. at 484 (The insured was negligent in selling gunpowder to a minor and "his negligence was a proximate cause of the accident.") These cases stand for the proposition that where the insured's liability arises out of his negligence, albeit in connection with the sale of products, the products liability exclusion is inapplicable, for the reason that the claim against the insured is not one "arising out of products" sold.

The majority answers the argument that this case is one involving liability for negligence and not products liability by quoting the following language from Tidewater Associated Oil Co. v. Northwest Casualty Co., 264 F.2d 879 (9th Cir. 1959):

"In practically every case in which injury or damage is caused by the handling or use of a product, or by a defective condition in such product, the occurrence causing the injury or damage can be traced to some pre-existing negligence. Indeed, were this not so the injured person would have no basis for a tort claim against the insured. Thus, if the allegation of pre-existing negligence were to be regarded as controlling, the result would be to emasculate the product liability exclusion." 264 F.2d at 882.

This reasoning, based upon the erroneous assumption that without some pre-existing negligence "the injured person would have no basis for a tort claim against the insured," is, in my opinion, fallacious. It completely ignores the existence of the doctrine of strict liability in tort. A retailer may be held strictly liable even though no culpable act or omission can be attributed to him; proof of negligence or fault is not required. McGinnis v. Fidelity & Casualty Co. of N. Y., *supra;* Carmichael, Strict Liability in Tort—An Explosion in Products Liability Law, 20

Drake L.Rev. 528 (1971); Keeton, Products Liability—Liability Without Fault and the Requirement of a Defect, 41 Texas L.Rev. 855 (1963); CCH Products Liability Reports, § 4010 (1970). Therefore, finding that coverage is not excluded where the seller's negligence causes injury would not "emasculate the product liability exclusion," for this exclusion would still exclude coverage of strict liability in tort in products liability cases. The need to insure against such strict liability is exemplified by the fact that recently a jury awarded $3,650,000 in a case submitted to them solely on the theory of strict liability in tort. Bush v. Westinghouse Air Brake Co., 2nd Judicial District Ct., Washoe County, Nevada, Oct. 16, 1970 ($3,000,000 awarded to plaintiff, $500,000 to plaintiff's wife for loss of consortium, and $150,000 to their three children for loss of parental guidance of father; for further discussion of case, see 13 A.T.L. News L., No. 9, at 394–395 (November, 1970); Time, Dec. 7, 1970, at 68.)

The propriety of the conclusion that the products exclusion is inapplicable in this case is buttressed by the presence of two other exclusions incorporated in the policy issued to Parma Seed. One of these, endorsement "L–144," excludes coverage for:

"Erroneous delivery of seeds, meaning wrongful filling of orders whereby the seed genus or species delivered differs from thet [sic] ordered by the customer."

The majority opinion holds that the products exclusion excludes coverage for the erroneous delivery of a product (here, weed killer), meaning the wrongful filling of orders whereby the product delivered differs from that ordered by the customer. It is obvious that under the majority's construction of the products exclusion, the above-quoted portion of endorsement "L–144" is completely superfluous. Such a construction flies in the face of the generally accepted rule that an insurance contract should be read as a whole and should be construed in a manner which does not render any of its provisions superfluous. As one noted authority on insurance law puts it:

"*A construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent.* No word in an insurance policy should be assumed to be superfluous, or treated as superfluous or redundant if any reasonable meaning consistent with the other parts of the policy can be given to it. Clear and plain provisions of a contract, if not contrary to or forbidden by law, shall not be excluded by the court as an improper or unnecessary part thereof. Every clause will be enforced where that can be done without doing violence to the rights of either party, and to do so does not violate the language of the instrument as a whole. The policy should also be interpreted with a view to the whole context, so as, if possible, to give a sensible meaning and effect to all its provisions and to avoid rendering portions of it contradictory and inoperative by giving effect to some clauses and nullifying others. All terms and clauses, even though apparently repugnant, should be reconciled if it can be done by any reasonable construction." Couch on Insurance 2d, § 15–43 (1964) (emphasis added).

Endorsement "L–128" excludes coverage with respect to:

"property (or the loss of use thereof) upon which a fertilizing agent was either intentionally applied or intended to be applied [by] the named insured or by a person acquiring said fertilizing agent through or from the insured."

Under the majority's construction of the general products exclusion, endorsement "L–128" is also rendered unnecessary; and, therefore, as pointed out above, such a construction should not be adopted where it is possible to do otherwise.

Since I have reached the conclusion that the products portion of the exclusion in question in inapplicable in this case, it becomes necessary to decide whether coverage is excluded by the "completed operations" portion of the exclusion. That portion ex-

pressly provides that: "the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pickup or delivery, except from or onto a railroad car." Since Parma Seed's liability arose out of the *delivery* of herbicide which differed from that ordered by its customers, this delivery was not an "operation." *See* Ketona Chemical Corp. v. Globe Indemnity Co., 404 F.2d 181 (5th Cir. 1968). At the very least, the word "delivery," as used in the exclusion, is ambiguous; and, therefore, its meaning must be determined in light of the principle that ambiguities in an insurance policy must be resolved in favor of the insured. Stephens v. New Hampshire Ins. Co., 92 Idaho 537, 447 P.2d 14 (1968); Medical-Dental Service, Inc. v. Boroo, 92 Idaho 328, 442 P.2d 738, 36 A.L.R.3d 458 (1968). The insurance company wrote the policy, and if it wanted the word "delivery" to have a restricted meaning not ordinarily assigned to it by the users of the English language, it should have defined it specially in the policy's "definitions" section. Or it could have used the phrase "pick-up and delivery (except misdelivery)" instead. *See* Hardware Mut. Cas. Co. v. Schantz, 186 F.2d 868 (5th Cir. 1951) (policy used the suggested wording). This patent ambiguity is reinforced by the ambiguity created by the presence of a specific exclusion for misdelivery of seeds (which would be unnecessary if such were a "completed operation").

Finally, the rule is fundamental that where a clause in an insurance policy is susceptible to more than one construction, the one most favorable to the insured must be adopted. Stephens v. New Hampshire Ins. Co., *supra*. That the "Products and Completed Operations Exclusion" is susceptible to more than one interpretation is manifested by the very history of this case on appeal: it has been under consideration by this Court for more than two years; it has been argued three times; and one opinion previously issued by this Court has been vacated. Admittedly, this is a close case, but in such a case, the benefit of the doubt is supposed to be given to the insured; this the majority has decided not to do.

The judgment of the district court should be affirmed.